Good morning. Good morning. Arizona and Maine. Good morning. May it please the court, I am Christina Reeves and I represent the state of Arizona. I'd like to use about 15 minutes of my time for my initial argument. Okay, then that would leave you 15 minutes on your rebuttal then. Yes, your honor. Okay, you can go ahead and proceed and we'll start the court. Thank you, your honor. This is a habeas case, and as such, I prevailed today, which means that in order for Apelt to get relief on any of his claims, he's got to push a very large rock up a very steep hill. And for all of his claims, Apelt has failed to do so. Apelt's ineffective assistance of sentencing counsel claims, which were raised under Claim 12 in his habeas petition, fail because they are procedurally defaulted and Apelt cannot excuse the default. Can I – yeah, I'd like you to focus on that. So just so that we procedurally get what your focus is and that you make your strongest argument on this, that because for them to get through that, they have to get through the Martinez shoot, right? They have to excuse the default under Martinez. Martinez offers the only viable idea of excusing defaults, but unfortunately for them, Martinez does not excuse the defaults. So – but in terms of the record as it was developed, there was a quick PCR right after that was going on at the same time as the direct appeal that had to do with the right hand, left hand. Is that correct? That was not the IAC. That is correct. The procedural posture of the case when it came to habeas is that during the direct appeal proceedings, PCR counsel filed an initial PCR petition while the appeal was still proceeding, raising the single claim of new evidence. The Arizona Supreme Court considered that PCR claim in addition with its appellate review and denied relief on it. And then it went back to the trial court and Apelt had a second PCR proceeding in which he raised new claims of ineffective assistance of trial counsel. And that was with a new lawyer, not Villareal. That was with a new lawyer, not Villareal. And the court – the state court found that all of those claims were precluded because they had not been raised in the initial PCR proceeding and alternatively found the claims all lacked merit and dismissed them on that basis. So what – that was the superior court, right? That was the trial court, yes. So what specifically did the order say there? The order said that it went over the claims that Apelt had raised. It said that it found that the claims were precluded because they had not been raised in the initial PCR proceeding and then said alternatively and then cited Strickland's deficient performance and prejudice prompts and found that the claims lacked merit. So it's your position that the superior court not only said it was procedurally defaulted but then went ahead and did a merits determination? Yes, Your Honor. And the court's order says that they did a merits determination that it said alternatively I've considered these claims under the Strickland prejudice and deficient performance prompts and found that they lacked merit and I'm dismissing them on that basis as well. Then it goes to the Arizona Supreme Court, right, at some point. It makes it there. And then the PCR petition was reviewed by the – they appealed the denial of the PCR petition to the Arizona Supreme Court, which summarily denied review. So the trial court's decision is the last reason decision on these issues. Okay. So your position then at this point – so that's the record that we're basically reviewing and that's what was before Judge Silver? That is correct, Your Honor. And Judge Silver initially found that the claims were procedurally defaulted correctly. Then after the Supreme Court's decision in Martinez, she revisited her findings of procedural default. However, she did not find that the claims were excused under Martinez. Relying on this court's decision in Claiborne v. Ryan, the district court found that the alternative merits ruling of the state court vitiated the procedural default and rendered the claims not procedurally defaulted. And of course, that is contrary to Harris v. Reed, to the decisions of this circuit, and to all the other circuit courts of appeals, that an alternative merits ruling does not vitiate a procedural default. So that was erroneous. The claims are procedurally defaulted. The only hope a fault has is to excuse these claims under Martinez, but you cannot excuse the claims under Martinez for two reasons. Well, did Judge Silver really make that finding, or did Judge Silver just go to the merits? Did she implicitly make the finding? No, it's quite explicit. In her initial finding that the claims were not procedurally defaulted, it was confusing. And the state was confused and thought that she had excused the defaults under Martinez and did a motion for reconsideration explaining that the defaults could not be excused under Martinez. The court denied the motion for reconsideration explaining that she had not excused the defaults under Martinez. She had simply found that the claims were not procedurally defaulted at all. And in her response to our motion for reconsideration, she makes that finding explicit. Okay. So then from your perspective, as we're reviewing this, tell me the standard of reviews. And it's still your position that they're procedurally defaulted. And if you could give me a summary of your best argument on that. And then go from there and say if – I'm just going hypothetically. Say for – because we haven't discussed the case, so I'm not representing – I'm asking you hypothetically. If we were to find that it makes it through for – that we can review it on the merits, what's the standard of review? And then if we got to the merits, then to discuss the prejudice prong. Well, there's three steps that APAL has to get through before he can get relief on this claim. First, he has to show that the procedural defaults are excused. Then he has to show that the state court's rejection of his claims was an unreasonable application of clearly established federal law. And he wants to get – if he was able to make it through that criminal barrier of APAL, then he has to show that under this court's de novo review, he would be entitled to relief. He fails on all three. But my best argument – I've already made my argument for why they're procedurally defaulted. Why the procedural default is not excused under Martinez, there are two reasons. One is that Martinez – the narrow and limited circumstances that were described in Martinez do not apply here. As recently, the Supreme Court in Davala v. Davis explained that the animating equitable consideration that drove the Martinez decision was the concern that if the defaults were not excused under those limited and narrow circumstances described in Martinez, then there was a possibility that claims of trial, counsel, and effectiveness may never be heard by any court. And in Davala v. Davis, where the Supreme Court was considering whether or not to extend Martinez to claims of appellate counsel IAC, the court found that because that concern was not present with those claims, the concern that the claims would never be heard by any court was not present, then Martinez did not apply. Here, APAL has had his claims heard by one court. The state trial court heard his claims. APAL has had his claims heard by one court. Equity does not require them to be heard again. Martinez does not apply to excuses defaults. This is hypothetical again, but what if the panel were to look at that on the IAC, and it's essentially the failure to investigate, that part of it. If the panel were to conclude that no reasonable jurist could conclude that that was not the first prong of strictly, that not going to Germany, not looking, all of that, if there would be no reasonable jurist or no fair-minded jurist could conclude that, then what happens? Does that get through? Does that get through to get to the merits? No. To back up, there's still a second reason that it doesn't excuse the defaults under Martinez, but I think you're going to the unreasonable application. And when you're considering the unreasonable application, consider the unreasonable application of clearly established federal law, which is the clearly established federal law that existed at the time of the state court's decisions. So when considering what a reasonable jurist would have done, that's not the standard. The standard is whether or not it was an unreasonable application of clearly established federal law that existed at the time of the state court's decision. And at the time of the state court's decision, the Supreme Court had decided Strickland, Darden, and Berger. And in each of those cases, the claims had been raised that counsel had failed to adequately investigate mitigation. And the Supreme Court denied those claims in each of those cases. And those cases provide the clearly established law that the state court was obligated to reasonably apply. And looking at those cases, it's unquestionable that the state court did. In Strickland, the Supreme Court stressed that in considering a reasonableness investigation claim, it does not hinge on what evidence may have been found during the investigation. It's what the counsel knew at the time he decided not to investigate further and whether or not that provided a reasonable basis for him not to investigate further. Well, shouldn't, I mean, capital cases, you know, going back a long time even, you know, a bad childhood, mental illness, you know, all of those type of things have always, I mean, they've pretty much been around too, that's one thing. You may not present it, but you investigate it and look at it as possible mitigation. And the way that APELP was presented in the penalty phase was basically, well, you know, his childhood was somewhat normal that he was in the military. But as it turns out, I guess they got him out of the military because of, you know, mental illness. And it's discovered that he had a very poor growing up with an abusive father, that he was sexually abused, and there's those type of things. Wouldn't those be the type of things that are pretty standard, you know, investigation? Well, the military, the defense counsel did present evidence of the military discharge. And just, not that it relates to the mitigation, but the mental illness for which APELP was discharged, the evidence that was presented at the Atkins hearing that indicates that the code used on those mental discharge papers was that the mental illness for which he was discharged was homosexuality. So I don't know if that homosexuality is a mitigating factor. I don't think it is. But if you look at Berger and considering those facts, in that case, the defense counsel presented absolutely no mitigation evidence whatsoever. And it did so in two different sentencing hearings, because the first sentencing hearing, where his client received death, was set aside and he was resentenced. And again, even though that tact hadn't worked the first time, he did it again. But in that case, the Supreme Court lists all of the horrible, horrendous childhood that Berger had. His childhood, APELP child appears in comparison to what Berger experienced as a poor childhood. And the defense counsel talked to his mother and knew he had a bad childhood, but did nothing further, did not investigate anything further at all. And the court found that that was not deficient performance. It said, granted, defense counsel could have done more, but in ineffectiveness assistance claims, it's not what is good or what is prudent, but only what is constitutionally compelled. And that is the guidance that the Supreme Court was providing to state courts at that time. And the Supreme Court in Strickland, in Darden, in Berger, repeatedly stressed that judicial deference to counsel's decisions was paramount. And with that kind of guidance and that clearly established federal law, at the time of the state court's decision, the state court did not unreasonably apply any of those cases. I know I'm monopolizing your time to an extent, but I just want to have these questions answered and then That's what I'm here for, Your Honor. talk to the other side. So if you would humor me here, let's assume that everything that is now discovered in a part of the record that would be part of this record. Explain to me how, if he went back, if now putting all of that in front of a judge, would there be a different answer with the facts of this case? And explain to me that. In this court, that's basically getting to a de novo review of the prejudice, considering all of the evidence that was not only before the state court and all of the evidence that was presented in the federal court that Apelt has alluded to. If this court were to conduct a de novo review and conduct a prejudice analysis, the state still maintains that it would not, there is no reasonable possibility that Apelt would have received a sentence other than death. Tell me why relative to the facts in this case. I mean, I know that this was a planned murder. I know that basically that the facts that were argued were that he and his brother and the girlfriend decided that they were going to try to get money from women and that they were going to try to marry someone. And then he actually went forward and spent two months trying to get life insurance policies and some didn't work. And then right after he finally got one that worked, then they took part in the murder, which had fairly, you know, the facts of itself were fairly heinous. So tell me how it wouldn't have made a difference. It wouldn't have made a difference because the facts of the case were, as this court said, extremely heinous. Apelt planned for months the crime that he committed. He met Cindy. He courted her. He married her. He convinced her to care about him, all the while knowing that he planned to murder her. And then as soon as her life insurance policy took effect, he turned from the loving husband that she thought he was into a kidnapper and shoved her in the trunk of her car, drove her out to the desert, beat and stabbed her, cutting her in the neck so bad that he almost decapitated her, and then he left her lifeless body in the desert while he went to have drinks. And then he attended her funeral. And while the people that actually loved Cindy mourned her loss, he left. Under those circumstances, and then also the fact that even if the psychological evidence that Apelt had presented says that he had wanted to present, the state would have been able to rebut that with evidence that Apelt had antisocial personality disorder. And numerous courts have found that that is literally double-edged evidence, that that kind of evidence is overwhelming in terms of aggravating it and earning of a death sentence. Okay. Do either of my colleagues have a question? Ms. Reed, how do you define the legal question that is before us for determination? As to Claim 12, the legal question before you, because this is an AEDPA case and because this is a habeas case and AEDPA rules, is that first this court has to find, before it can even consider whether or not the state court's rejection of his claim was an unreasonable application of clearly established federal law, the court has to find a way to excuse those defaults. And there is no legally viable way to excuse those defaults. Martinez does not excuse the defaults because the equitable concern that was in Martinez does not apply. And secondly, under Martinez, Apelt has to show that his first PCR counsel, where the claim should have been raised, was ineffective under Strickland. That requires a showing of deficient performance and prejudice. But the state court's alternative merits ruling in the second PCR negates any rational argument that there was a reasonable probability that if Apelt had raised his claims in the first PCR, that the court would have granted relief. The only difference between the claims being raised in the first PCR and in the second PCR was timing, and timing did not affect the merits of the claims at all. He cannot show prejudice. The claims were heard by a court. Martinez does not excuse his defaults. Okay, thank you. I'll give you, since we wanted to focus on your argument, I'll give you 15 for rebuttal. Thank you, Your Honor. Good morning, Your Honor. Good morning. May it please the court, my name is Emily Skinner. I'm here with Dana Carpenter, and we represent Michael Apelt, the petitioner in the case. Are you going to be making all the arguments, or are you splitting time? No, I will be arguing.  Go ahead and proceed. I would like to save five minutes for rebuttal. All right, well, I'll be similarly generous as we focus on your arguments and what we want to talk about. Thank you, Your Honor. When Judge Bean sentenced Michael Apelt to death in 1990, he had never heard that Michael was born the product of rape, that his father beat him daily with sticks and his fists, that he killed the family dog, that he locked Michael and his brother in the basement and tortured them, beat them on their genitals, or that this abuse drove Michael to his first suicide attempt at age seven. Judge Bean never heard that Michael was educated in a school for intellectually disabled children, where he struggled to keep up with his peers, and that at age 16, Michael preferred the company of his 10- and 11-year-old cousins because they played games he could understand. Due to trial counsel's ineffectiveness and the court's refusal to fund the tools of the defense, Judge Bean was deprived of hearing life-saving mitigation, and he sentenced Michael to die. What would they have looked for to mitigate this case? I realize you're not required to know what the mitigation evidence would be, but what kind of evidence would have mitigated, considering the facts of this case, what kind of evidence would you have tried to find? Well, there's no doubt that the facts of this crime are tragic, but as Judge Silver recognized in the district court, in order to succeed on his claim of ineffective assistance of counsel, Mr. Apelt does not need to prove that the mitigation would have outweighed the aggravation. He merely needs to prove sufficient mitigation to undermine confidence in the outcome. In the second post-conviction proceedings, the 1995 post-conviction proceedings, there was substantial evidence of mitigation presented, and far more since then, including this incredibly abusive upbringing. There was evidence from Michael's brother that their father, Rudy Sr., was actually a Nazi. He was clearly sadistic. He regularly beat the family, sexually assaulted Michael's mother and his sisters. Well, I think that those are all really bad, obviously. I don't disagree with you on that point at all. But I'm trying to, from the standpoint, going back to my days as a trial lawyer and as a trial judge and seeing what jurors and what they do, is sometimes you have these things and the person is charged with, say, a sexual assault crime on someone and being sexually abused, kind of it resonates more with that type of offense. This offense here, being really plotting for money, which tends to be looked upon in many ways by jurors and judges as being the most cold-blooded in terms of... And then that he had... This is not an impulsive crime. It goes on over... It's a plotting crime that took a lot of planning, and then every time... And then he lives with this woman for two months, allegedly sleeps in her bed, all of those things, and then every time... And they don't get the life insurance policy right away. He has so many opportunities to jump off and reconsider what he's doing, and he never evades this. And he still has this girlfriend, and he gets his brother involved, and then even after... And then immediately, the second that they've got the life insurance policy in place, they take her out and commit a really heinous crime on her, and then they even go to bringing in this homeless guy to make a call and a... I mean, it's very plotting. It's very over a long period of time, so you don't have the impulsiveness, let's say, or you don't have the compulsion that you might have with a sexual predator. So that's where... Connect the dots for me on that. I mean, those are hard facts to overcome. And it's like, okay, so you had a bad life. You still... You're a bad person. Well, Michael not only had a bad life, he had just an incredibly abusive upbringing. Incredibly what? Abusive upbringing. The facts about his father tying up Michael and his brother Rudy in the basement and torturing them, these are facts that have an impact on the sentencer. And there were three aggravators in this case, but as the district court noted, the F4 and the F5 aggravators have some overlapping facts, and so they're not entitled to weight as two separate aggravators. And so we're looking essentially at the F6 and then this overlapping F4 and F5 aggravators. So in order to undermine confidence in the outcome, Mr. Apelt doesn't need to show that the crime was impulsive or that his mitigating background caused impulsiveness or caused him to commit this crime. These are the sorts of mitigators that have been found by the circuit and the U.S. Supreme Court to be classic mitigation. And it started from before Michael was born. His mother thought that she had been sterilized and did not want any more children with her abusive husband. He sexually assaults her, and she becomes pregnant with Michael. And then his entire life was being beaten, living in extreme poverty. He struggled incredibly, even in his school for intellectually disabled children. There was evidence in the Atkins hearing that a teacher's aide found his behavior so noteworthy that she wrote her thesis about him. He was in the military. He was discharged for mental inadequacy, whether that was homosexuality or something else. The fact is he never really had a successful life, and I do think that that undermines confidence. The question I have for you is, the district court in this case recognized that mitigation evidence was not presented. I think we can all agree it wasn't presented, and let's assume for a moment that Villareal blew it in Strickland error as to his performance. I did not see the district court explain why the mitigation evidence here. The question that Judge Ferris asked, I don't see the district court explain why that mitigation evidence would have made a difference. District court clearly said mitigation evidence, it's classic mitigation evidence, it should have been presented. But I think at this stage in the game, we have to go a little bit further than that, and we have to say under AEDPA, why would that have been a reasonable probability of a different outcome? Did the district court ever engage in that analysis? Well, the district court definitely pointed to this circuit's history of finding ineffective assistance of counsel in other highly aggravated cases with very tragic facts. You know, I don't know what to say other than this is the sort of mitigation that does have an impact on sentencers. It humanizes the defendant. It shows... All true, and again, this is a very good question. This is a gross analogy, so I'm not equating your person with this person, but if Adolf Hitler came in and said, I had a really bad childhood, and at my sentencing here at the Nuremberg trials, my lawyer didn't present any of the mitigating evidence for me, I could see the Nuremberg court saying, well, okay, even if we had known about the fact that you had a rough childhood, we're still giving you the death penalty. Now, I'm not saying your client is the same as Adolf Hitler, but there has to be some analysis as to why it in fact would have mattered, why it would have changed things. And I didn't see the district court engage in that analysis at all. And I want to make sure I haven't missed something in the record showing the district court actually did go through and explain why this mitigating evidence would have in fact made some sort of difference. Well, I think that the district court recognized that it's inherently mitigating. When the sentencer hears this sort of life-saving evidence, they're inspired to sentence the defendant. I mean, we don't have to prove it in every case. No, I agree, but I guess I'm going back to what the district court wrote. Can you point to me in the excerpt of the record where the district court said that this mitigation evidence was so powerful that despite the very ugly nature of this crime, the trial judge would have done something differently? I'm not able to pull that up immediately, but I would be happy to address that in a rebuttal. Maybe in your rebuttal. That would be great. Thank you. Well, I guess on that point, on things that are inherently mitigating, if I'm using your word here, some of these things can have a double-edged sword. They can be a double-edged sword, too, because if you've had this really difficult life, sometimes people shoot. It can also be judged in a way that it shows that you really are so hardened and you're so callous that it makes it worse. They don't always cut just one way. I guess that's what I'm saying. And what Judge Owens is saying is where did the district court sort of wrestle with this? Sure. Well, like I said, on my rebuttal, I will provide this court with a record site. But I'm just saying, when you look at things like that, and I know you're an experienced defense counsel, that just because someone had a bad childhood, ergo, it doesn't always follow, that that helps out explaining, that it equates to mitigation of... I mean, you described this as tragic. I mean, I think another way, you could also say that the facts, as they go against your client, are pretty cold-blooded in plotting. So certainly, I guess, tragic to the deceased in this, but they're not really... I don't know that tragic is the right description of those facts. Well, I would also say that Mr. Apelt does not need to prove that the mitigation explains the crime. He doesn't need to show that he has impulsivity and that impulsivity caused the crime. But in terms of when we're looking at it and analyzing the prejudice prong, what is it? What's the standard there? It's whether there's a reasonable likelihood that the outcome would have been different, and that means showing that the mitigation is sufficient to undermine confidence in the outcome alone. But at this stage, it would be that no fair-minded jurist could conclude otherwise. Well, right. We do have to show that the state court was objectively unreasonable in applying the Strickland standard. Because that would be under ADPA review there, right? Right. Okay. Moving on, I wanted to address an issue that came up in the state's brief, the third brief on cross-appeal that I didn't get to reply to, and the state argued that the aspect of the ineffective assistance of counsel claim related to the trial court's denial of funds was precluded and that this court didn't have jurisdiction to review that. So I just want to address that briefly. That's not true. The facts related to the trial court's denial of funds were raised in two ways. They were raised on direct appeal as an 8th Amendment and 14th Amendment denial of resources claim, and then it was raised as part of the IAC claim in post-conviction. So in habeas, both claims were raised. And in habeas, the 6th Amendment was cited in the denial of resources claim. The district court said that 6th Amendment was precluded in the denial of resources claim. But the facts regarding the trial court's denial of funds have been argued as the IAC claim all along, so that is properly before this court. What the trial judge back then was presented with, essentially, Villareal really didn't follow through on giving good reasons. I mean, it's hard to fault the trial judge for not giving them the money when he didn't do what the trial judge said the trial judge needed to look at to give the money, right? Well, I think they're both at fault. Clearly, Villareal should have filed this written notice that the trial court requested. It was a simple request. It was completely in line with the client's best interest, and it would have given the opportunity for defense counsel to make a written record before the trial court of what he needed to do in Germany. There's no excuse for him not filing that. However, he did make this verbal record stating that defense standards required him to conduct a mitigation investigation identifying certain areas that he was particularly interested in, including Mr. Apel's history of psychiatric hospitalization and a difficult childbirth. And nevertheless, the trial court said, well, this has been a very expensive case, and so it's denied pending the filing of this written verification. Go ahead. Oh, I'm sorry. I was just going to... No, I was thinking to ask you a question, but I'll let you. Go ahead. Okay. Thank you, Your Honor. I was just going to move on to the denial of resources claim. And this court has... This court has found, and other circuit courts have found, that Acve, Oklahoma, is not limited to the appointment of a psychiatrist to conduct a psychiatric evaluation. In U.S. v. Chase, this circuit court found that Acve, Oklahoma, gave a 14th Amendment right for the defendant to have access to a chemist in a drug case. In Terry v. Reese, the Sixth Circuit said that the 14th Amendment in Acve, Oklahoma, gave the defense the right to a pathologist. Certainly, the states have found that Acve applies to a host of expert assistants, including fingerprint examiners, DNA experts, handwriting analysts. So the state's position, Acve, Oklahoma, is a very, very narrow case, I think is too narrow. It clearly stands for the proposition that the defendant... When the defendant is an indigent, he's entitled to have the trial court or the state pay for the tools of a defense, the tools needed to put on his defense. And... If there was any problem for you that on this record, the only non-death aspect would be ineffective assistance of counsel, it's in... Because the record would make it very difficult for somebody to find some other basis to set aside the death penalty. So I always wonder, and I wonder here, whether instead of inefficient counsel, you had a clever counsel. Because the only thing to argue about in this case is deficiency of counsel. Is that a fair statement? I'm not sure I understand Your Honor's question. Well, I think what I am hearing here is that when the facts are really bad against you as defense counsel, clever defense counsel would know that IAC later might be the best arrow in the quiver. So... That... Why isn't this clever counsel as opposed to IAC counsel? Well, I don't think there's anything in the record to suggest that Mr. Villarreal sandbagged the defense. Well, there might be because he said, didn't he in this case, didn't he indicate a reason I was not... Do you recall that part of the statement? He said, I didn't think this, I didn't think that. He narrowed the reason for his not going forward. Didn't he? Well, if he... Do you recall the language I'm referring to? I don't, I'm sorry. But if he was intending to preserve some kind of ineffectiveness claim, then I don't think he would have filed a state post-conviction immediately after trial where he raised a single claim and it wasn't his own... But he was trying to get a not guilty. I mean, Apelt didn't admit the crime but say it was lesser, right? I mean, Apelt was... And the right-handed, left-handed after was to try to show that he couldn't have been... That he could not have been the killer because I'm forgetting that your client is left-handed? Yes. And the killer was right-handed. Was right-handed, yes. And so, because the testimony at... Your client testified at trial, right? He did. And also, is it Dorn? Yes. She testified and as to the brother, I think she was impeached on various things but in terms of she somehow... She puts them at the scene, you know, there's things that go on that way. So he... But he never says, okay, I was there at all, right? Right. Because he was trying to say he has a different size shoe than the footprint, this, that, and the other. I mean, he wasn't there and then they've got the defense of... They went that there's that recording that supposedly someone else admitted to killing her and leaving her body out there. So Villareal's thrust of his was that he was not guilty of the crime early on, right? And the first PCR was to hopefully bolster that and get a new trial on that, right? That's correct. Not so much the penalty phase on the guilt phase. Right. But Mr. Villareal provided a declaration in the second post-conviction proceedings stating that he did not have a strategic reason for failing to file the verification that the trial court asked for. He did not have a strategic reason for failing to investigate. That's the language I asked you. Did you recall that? I thought you said you did. I'm sorry. I just misunderstood, Your Honor. Maybe I didn't phrase the question well enough. But that's the language I'm talking about. He narrowed the possibility to one thing and that is ineffective assistance of counsel.  Well, he attempted to narrow it to the only thing here was ineffective assistance. I mean, it would be a pretty big risk for defense counsel to not conduct any mitigation investigation and then hope 30 years down the road. Well, if he knew there was nothing to find. I'm sorry. I just don't see that supported in the record. Do you want to address possibly, I think counsel for Arizona talked about what the law was at the time in terms of the duty to investigate in cases that she felt supported her position. Do you want to address? Yes. Because we have to go back to what the standard was at that time. Sure. At the time... I mean, it's like we can't import, well, you should have had DNA testing done. Back at that time when they didn't even do that. I agree. Mr. Apel was sentenced to death in 1990. In 1989, the ABA guidelines were first released. The guidelines for the appointment and performance of counsel in death penalty cases. Mr. Villareal cited a set of guidelines. It wasn't clear whether it was the ABA guidelines or something else, recognizing that it's his duty to investigate the client's background. He listed a host of witnesses that he would need to interview, including family members, friends, school teachers, doctors, et cetera. Also, Strickland v. Washington, of course, was the clearly established federal law and it requires Capitol Defense Counsel to conduct a thorough investigation and says that strategic decisions about the presentation of mitigation have to be made in light of the investigation. Well, there was no investigation done. The other cases cited by the state, Darden v. Wainwright, showed that counsel was engaged in extensive preparation prior to trial, including preparation for the sentencing, whereas Mr. Villareal did not even request funds until after his client had already been convicted and approximately six weeks before the sentencing hearing was held. Berger v. Kemp, there was a psychologist that evaluated the defendant. The defense counsel had uncovered some mitigation and determined that that mitigation might look badly on the defendant and so chose not to present it. These are not strategic decisions that Mr. Villareal made with regard to Michael A. Pell's sentencing. He didn't conduct any investigation. He presented some minor records that were faxed to him a few days before the sentencing hearing and that is what he used to argue that Mr. A. Pell should be sentenced to life. I also think it's important to note that the only witness who testified at Mr. A. Pell's capital sentencing hearing was a police officer that the state had sent to Germany to investigate and collect evidence that would be supportive of a death sentence. So by 1990, the right to have a mitigation investigation, the right to have an individualized sentencing and have the sentencer consider important background facts about the defendant was well established and nevertheless, Michael A. Pell did not receive that. The judge let you put in letters, which I guess arguably, I think there was a whole hearsay kerfuffle at that point, but let you put in letters from defendant's relatives saying he couldn't have committed that crime or he wasn't a perfect guy, but he wasn't that bad and a number of things along those lines. And then I think there was an objection, but the state put in evidence of the officer going and supposedly the defendant's ex-wife said, oh yeah, he is that type of guy. He wanted me to sell my kidney for money and so there was all of that that went on, I guess. He couldn't have done it. Oh yeah, he could have done it, but... Right, there were some letters put on by family. There was a letter from a former employer saying that Mr. A. Pell's treatment of his coworkers was not objectionable and there was a record from the German military showing that he had been discharged. Let me ask you this, this is taking you a little bit back and I'm going to give you a little extra time, so I would like you to answer, because I think Counsel for Arizona mentioned Davila v. Davis. Is relief under Martinez barred in this case under the Supreme Court's recent decision in Davila v. Davis, which they argued because one state court considered A. Pell's IAC claim on its merits? I don't think that Davila does preclude the Martinez v. Ryan application in this case, because Davila, first of all, was about whether or not Martinez should be expanded to claims of ineffective assistance of appellate counsel, where state post-conviction counsel failed to raise a claim of ineffective assistance of appellate counsel, and that's not an issue in this case. We're dealing with state post-conviction counsel's failure to raise claims of ineffective assistance of trial and sentencing counsel, which clearly fall within Martinez. And Martinez was about the defendant's equitable right to have his claims presented. In this case, Mr. A. Pell did end up presenting his claims in a second post-conviction proceeding, but if Davila says that Martinez doesn't apply anymore, then once again we're in a situation where defendants who have ineffective post-conviction counsel are going to be precluded from ever having their claims truly considered and eventually heard in habeas proceedings. And it's important to note that in this case, the state court decision was absolutely objectively unreasonable. The second state post-conviction counsel presented substantial new evidence of the abuse, of the poverty, and that was just disregarded as not even presenting a colorable claim by the state post-conviction court. Does anyone have any questions more at this point? Okay, I'm going to give you an extra 10 minutes because that's what I gave them. So you have an extra 10 on rebuttal plus what you've reserved. Okay, thank you. The one thing you haven't talked about, and you can ignore it if you want, there was money made available for the prosecution to go to Germany. There was. And the request was for money for the defense to go to Germany. Now, when we look at the record and we see that money was made available for the prosecution to go to Germany, and we know that the crime was committed in the United States, all the witnesses were in the United States, what from this record would be the purpose of the prosecution sending somebody to Germany except as it might have to do with the penalty phase? The only purpose for sending somebody to Germany would be to do with the penalty phase because back to that heavy rock, pushing up a steep hill... Yeah, I'm suggesting it would have to do with the penalty phase, and that's what the defense said. We want to send somebody to Germany. And they said, nope, we don't have enough money. We've already spent $200,000. But they did not say we don't have enough money. They said... How much are we going to spend on this case? They said there is a state law that you can have this money under state law if it is necessary for an adequate defense. That's what the Arizona state statute says. You get this money if you can meet this standard. Apel didn't meet that standard. He didn't satisfy state law, and so the trial court denied his request. Well, we don't know because we don't know what he might have found because he didn't go. We don't know what he might have found, but under Arizona law, he had to meet that standard, and he didn't. And this is a hideous case. Excuse me, I understand the nature of the case, and that's what I'm asking you to focus on is the one point. The prosecution, with all of the evidence, and it certainly had all the evidence, everything that happened in the United States. So the only reason the prosecution could have wanted to send somebody to Germany had to do with penalty. Now, do you think that's a fair conclusion from this record?  I think that it was okay for them to go, but Apel was not able to satisfy state law to get a trip to Germany. And because this is a case that's in habeas, and the state Supreme Court evaluated that claim, and they found that the trial court had not abused its discretion in denying that request under state law. Now we're in a habeas court, and under habeas back to that very large rock up the very steep hill, Apel has to show that there was clearly established federal law that established his constitutional right to that funding. The only right he had to that funding was under state law. There is no clearly established federal law that establishes a constitutional right to a mitigation investigation funded by the state. I realize I didn't argue it, but it seems a little peculiar, at least until you explain it, why the prosecution, with everything it needed to know, here in the United States, was able to send somebody to Germany, which they were, and did. And they were, and they did? At the state expense, I assume. At the state expense. Well, you didn't have everything you needed to know for the penalty phase here in the United States, because as a prosecutor that, you know, I'm not sure that the prosecutor did everything that I would have done had I been in that situation, because the prosecutor went to some German, it was a police officer that went to, it was Sergeant someone, I can't remember his name, but he went to the German police and said, he didn't get a certified copy of what we would have our criminal records, but he had them report to him what had been his crimes, and then he, you know, I guess talked to the ex-wife and did all of those type of things. Did you have to do an affidavit? Did the state have to do an, you know, provide some kind of request, like what the court was asking the defense to do? I do not know the answer to that. I don't know what the, I know that obviously the state law, the state funds wouldn't have been spent unless there was an accordance with state law, but what the state law was that the prosecution had to satisfy in order to get that fund, I do not know. But what I do know is that here in this habeas court, APOT has to establish that he had a constitutional right to that funding in order to get relief, because habeas only lies for claims that are grounded in the constitution. Well, he had a constitutional right to have even footing with the prosecution. There's no doubt about it, and we can assume that because that's why counsel is appointed for defense at state expense, because we want him to have, you're going to have a hard time answering your question  I know that, Your Honor. If the reason, and I'm not suggesting that this is pivotal, but I'm wondering why it isn't at least of some consideration. We look at a record where we see that all of the evidence, all of the facts, no doubt about it, everything that happened, happened within the state, and yet the prosecution felt some need to send somebody to Germany. I assume it had to do with the penalty phase. I assume just, and maybe if that's an incorrect assumption, you tell me. That's not the, I assume it had to do with the penalty phase. So the defense says, we want to send somebody to Germany. Says, what for? Well, it has to do with the penalty phase. And they said, nope, we've already spent, I think, $200,000. How much are we going to spend on this case? The amount of money you're going to spend can't determine what the constitutional right is, can it? Of course not. So what's the difference in this case? Does that pose a problem or not? It does not pose a problem. Why not? Because the funding, again, was under state law, and there is a, neither, it does not establish a right to state funding to conduct a mitigation investigation. And the APALT cited circuit court cases and state court cases that have extended APALT, but under White v. Woodhall, if a principle of law has to be extended before it can apply to the facts of the case, then by definition it was not clearly established. Well, let me ask you this, then. While I'm not sure that I'm not trying to make arguments for you, but while it may not save Mr. APALT on that claim, it's still related to the IAC claim, is it not? The failure to investigate. It's not, it would not be inconsistent for this court to say, okay, Mr. APALT does not prevail on failure to fund, but Mr. APALT could still prevail, and I know you don't agree with this, but he could on IAC and failure to investigate from the attorney's standpoint. I don't think that would be inconsistent. I mean, because the one thing on the failure to get the money, that sort of targets the judge, because the judge, what you're saying is there was a statute that said you have to say what you need it for, and at that particular time he didn't do it, and so the judge can't be wrong in applying the law based on that. But then we separately are looking at what Mr. Villarreal did or did not do in terms of his investigation, and that his not filling out the form, his not doing anything to get information from Germany, that can all go into that pile, correct? It can, but in order for the court to consider that pile, first it has to fund. Well, I know, we have to go through all the other analyses. Yes, again. But there's a way to consider his not going to Germany and still deny that other claim. Well, yes, but APALT, when APALT presented his, he presented a claim at the state court that counsel was ineffective for failing to present that additional information that would have satisfied the court. But in the state court, APALT admitted that the defense counsel presented all the information that he had and that he couldn't argue facts he didn't know. So he conceded that the defense counsel did not render deficient performance because he provided all of the information that he had. And with that concession, it could not have been an unreasonable application of clearly established federal law for the state court to have found that APALT had failed to show deficient performance. Was that part of the PCR or the right-hand, left-hand? No. In the right-hand, left-hand, that was the single claim. In the first PCR, the only claim that was raised was new evidence. But in the second PCR, APALT presented three claims of ineffective assistance to sentencing counsel. One was the failure to present additional information to the court to justify the trip to Germany. The second was the counsel's failure to use alternative means to conduct mitigation, and the third was the failure to adequately investigate mitigation. The court rejected all of those claims, and it was an unreasonable application of clearly established federal law for the court to have rejected those claims because, again, the first claim, APALT admitted there was no deficient performance. The second claim, counsel did use alternative means to conduct his mitigation investigation. Co-counsel did travel to Germany. If those alternative means had to do with amnesty and there were certain the State Department or what? He used Amnesty International to collect mitigation investigation, and also co-counsel traveled to Germany and conducted a mitigation investigation in Germany. So he did use alternative means. And co-counsel. You don't want to overstate it. The man's wife went on a vacation. She happened to be a lawyer. She went on a vacation to Germany, but while she wasn't going on the case necessarily, while she was there, she did some inquiries. She made some inquiries. Now, isn't that what this record shows? No, the record shows that she was appointed as co-counsel in this case. She wasn't just a lawyer. She was a lawyer appointed as APALT's defense counsel for this trial. And when she went to Germany, she did conduct investigation and mitigation, and she billed the State for that time. So she wasn't just there on vacation because the State wouldn't have paid for her vacation time. They paid for her to conduct a mitigation investigation as APALT's counsel. So you mean this record shows, you think, that the State did provide funds for the investigation in Germany? This record absolutely shows that the State paid for co-counsel's time in Germany conducting the mitigation investigation. The record, unless we are reading two different records, the record shows that the wife of the counsel, who happens to be a lawyer, went to Germany on vacation. While she was in Germany on vacation, she did make some inquiries, and she did bill for the time she spent on those inquiries. But the State never paid for her to go to Germany. Now, that's what I think the record shows. Tell me that I'm wrong. In ER 1715, the Excerpt of Record 1715, it shows co-counsel traveled to Germany. The State paid for her time during a mitigation investigation. Did she travel at State expense? No. From the United States to Germany was at her own expense. That's what I thought. Yes, I apologize if I misled the Court. The State paid for her time acting as co-counsel while she was there. When she returned, while she was there, she had no knowledge that she was going to be reimbursed. But when she returned, she submitted a bill showing what she had done, and she was reimbursed, but she didn't know going in that her time would be reimbursed. Now, isn't that the state of the record? There is nothing in the record that indicates that she did not know when she was conducting her mitigation investigation in Germany that she wouldn't be reimbursed for her time. I don't know of any. The record is silent as to what her state of mind was when she conducted that mitigation investigation as to whether or not. The case may not turn on that point, and I'm not suggesting that it does. But then that was also raised again when the other counsel, Villareal, was saying, okay, there was discussion about we need to take an interpreter because when my co-counsel was there, the family really was not a very good interpreter, and it did come up in that part of the discussion again, right? Yes, there was some discussion that there was a language barrier that got in the way of her investigation. And then I think the state said, well, why don't you hire an interpreter when you get there, or there was all that that went on. I believe that's right, Your Honor. I believe there was a discussion about that. And then I think the state ultimately, when counsel didn't file the declaration as to why he didn't comply with what the court asked him to do, I think he asked for another continuance, and the state objected because they said we're just going along too long. That's correct. The state took no position on the defense's request for funding to travel to Germany, but the state did oppose the request for a continuance. Okay. If the court has no further questions. I think that's it. So you have 35 seconds to, I guess, ask to reverse on your appeal and to affirm on their appeal. Exactly what you said, Your Honor. Thank you. I'm not a rocket scientist, but I did read the brief. Addressing Judge Owen's question about the district court's analysis of the prejudice, I would point the court to ER 11, which is the December 1, 2015, district court order granting the writ. There's a few pages of the court discussing the mitigation that had been developed in post-conviction, and the court cites Henry B. Linna and says, it's established that evidence about the defendant's background and character is relevant because of the belief long held by the society that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems may be less culpable than defendants who have no such excuse. The evidence of APAL's allegedly horrific childhood is the kind of troubled history we have declared relevant to assessing a defendant's moral culpability. So the district court recognizes that. It's relevant, but where did the district court do the prejudice analysis? I mean, it could be relevant that I had a bad childhood, but then you still have to match it up to what the crime, the facts of the crime, everything else that was there that a fair-minded jurist would otherwise conclude, right? Sure, and all I can do... Where does she conclude that? Where does she do that analysis? Well, all I can do is point the court to this December 1, 2015... That would be implicit? Is that what you're saying? I think it is. I think it's implicit in the district court's ruling in light. The district court definitely recognizes the terrible facts of the crime, the fact that there were multiple aggravators, and says essentially nevertheless this is the kind of mitigation that is so severe that the circuit court and the U.S. Supreme Court have found repeatedly that where counsel fails to uncover and present that mitigation, that the defendant has been deprived the effective assistance of counsel, and the state court ruling otherwise is unreasonable. I mean, it would seem to me that the closest the district court came is on ER 10, lines 9 through 12, where the district court wrote, in Appel's case, the omitted evidence of childhood deprivation, pervasive physical and sexual abuse, and delayed intellectual development is sufficient to undermine confidence in the outcome of the sentencing, notwithstanding the three aggravating factors. That was the closest I saw to coming, with at least an acknowledgement that there are these aggravating factors in the case and why this evidence would somehow undermine it. But I didn't see anything more than that. But again, at least we're talking about the same order. I want to make sure there wasn't some other order or some other document I had not seen. No, no. It would be the December order is the one that you would hang your hat on for this argument. That's right. There was the earlier order that I think was from September, and the court does find prejudice but does not make the AEDPA analysis in that order. I wanted to ask you about that because in the district court's analysis in December, one of the cases it cites is Stankiewicz v. Woodford. That's not an AEDPA case. I'm always concerned when we have courts analyzing prejudice in an AEDPA case and not relying on AEDPA authorities to do it. I take it your argument would be that Lambright and the other cases cited in the district court are AEDPA cases, so the district court at least maybe shouldn't have cited one of the cases, but the other cases support what it did. Well, quickly I would like to address the issue that came up with the state's argument about Vurel's law partner and his wife going to Germany. As Judge Ferris recognized, that was on her vacation. She was eventually appointed co-counsel, but that seemed to be an appointment made so that she could get reimbursed for her time that she spent trying to interview Mr. Apel's family. The record shows that she did not speak German, and she assumed that some family members or maybe some neighbors would be able to interpret, and they were not able to because their English was not sufficient. That's certainly not the mitigation investigation that the Sixth Amendment requires. It didn't lead to the individualized sentencing that the Eighth Amendment requires, and so I don't think that that counts as a mitigation investigation. What do we have to find, though? Don't we have to find that the mitigation evidence, assuming opinion, would be sufficient to change the outcome of this? Sufficient to undermine confidence in the outcome, yes. Take some fairly strong mitigation evidence in this case on these facts. Would you agree to that? I would agree, but I also would argue that the mitigating facts in this case are exceptionally strong. It's pretty unique to have a person whose father is actually a Nazi and used to tie him in the basement and beat him and sexually abuse him. These are unusual facts. Killing the family dog in front of the children for no reason other than to exert control over them, this is a unique case in that regard. I would like to address my action. I don't know if killing the family dog would help with jurors or a judge. That the father killed the family dog? Well, I guess. I don't know. Some of this, I'm wondering how much it would budge the needle and just say, now we know why he's so hardened and why he really did what he did. Well, I think it would give the sentence or insight into the type of horror that Mr. Apel was raised in. Killing the family dog. It might suggest what created the monster, but it might not suggest what caused the monster to do what he did in this case. Well, I would respect that. That's a question I'm not concluding. Isn't that on those two different questions? I don't think that, would Your Honor repeat the question? I think it's a double edge. It might have caused the monster, but it would not explain, it wouldn't excuse what the monster did in this case. Well, this type of abuse, I mean, I can't help it if a sentencer might misinterpret it, but this is the sort of abuse that courts time and time again have recognized does undermine confidence in the outcome. It might. In this case, we have to look to see that it might undermine, don't we? We don't have to find that it would. We just have to find that it might. Isn't that so? Yes. But isn't ultimately, all right, that's part of the process, but the end, if we're analyzing the prejudice, my understanding is that's under AEDPA and a fair-minded jurist would, that we would have to say a fair-minded jurist couldn't have concluded that, right? Right. Ultimate prejudice analysis, if you get past the procedural bar, has to be, it's under AEDPA review. Yes, I would agree with that. Okay. I would like to turn, with my last few minutes, to the Atkins v. Virginia claim. Sure. Okay. The state of Arizona seeks to execute a man who is intellectually disabled. Multiple experts testified to that intellectual disability, and nevertheless the trial court in the Atkins hearing found that he did not meet any of the prongs of the intellectual disability. Well, it was kind of, it was sort of mixed because there was the malingering factor that was mentioned. And my understanding is his brother, who also got the death penalty, did escape the death penalty under Atkins, correct? He did. And so that was a little bit a part of the whole calculus, and that your client was considered, I think, what did he have a test when he was young and he was 88? He did. There was this record that came in that showed in childhood there was this 88 IQ score. And one of the objectively and reasonable findings of fact that the trial court made was giving this 88 IQ score the same weight as the IQ scores from the testing administered by Dr. Roof and Dr. Curry, even though, even Dr. Moran, the state's expert, agreed that that 88 was too high. There was testimony from Dr. Curry that that was a group test, that it tends to overestimate intelligence, that it's administered by a teacher and not a psychologist. It didn't meet any of the requirements of the AAMR or the AAIDD in terms of administering a reliable IQ test. But you had to set that up. You have to look at that and compare it with the planning that went into this commission of this crime, don't you? Well, I think when you look at the entirety of Mr. Apel's life, it's pretty clear he's intellectually disabled. I mean, from childhood… I'm not suggesting he's not disabled. Was he capable of doing, of making the plans and executing them, the plans that he did make and that he did execute? Well, even being able to plan and execute a crime, that's not part of his inquiry in determining whether a person is intellectually disabled. Okay, but all of the evidence, what I saw here, it was all considered and it's ultimately up to the court to decide, right? Yes. And there is evidence of the 88. There is also evidence of how the crime was committed. There is also, I think, there's evidence of malingering that even the people… And then there's also evidence from doctors that think he does meet the Atkins standard. So is the court… doesn't the court get to look at all of that? And then we're, you know… And so there is some evidence that he doesn't qualify under Atkins. Well, let me go through and address this one by one. In terms of malingering, the state court misconstrued the record in terms of malingering. Both Dr. Curry and Dr. Roof provided exams to detect malingering. And they said if there was any malingering, they said it's possible. I detected some exaggeration, but it's not significant. It does not affect my opinion. And nevertheless, the trial court said, well, these doctors found that Mr. Apel was malingering. In terms of the crime, I would point this court to the recent Supreme Court decision in Moravie, Texas, which reaffirms Atkins' requirement that in determining whether a person is intellectually disabled, the court is required to look to the medical literature, the medical definition. And the AAIDD, the AAMR, these… Who has the burden? Mr. Apel has the burden. You have the burden. And the court basically said he didn't meet the burden, right? Right. But I am arguing that that was based on an unreasonable determination of the facts. Okay. And an unreasonable application of Atkins because of this disregard for the medical standards. And I would encourage this court to look at the order that was issued by the trial court in Mr. Apel's Atkins decision and his brother Rudy's Atkins decision, where the court looks at some of the same evidence and treats it very differently. For example, for Michael Apel, the superior court said he was married and he served in the military, and this shows some kind of strength and undermines his argument that he has adaptive behavior deficits. With regard to Rudy Apel, the superior court said, well, he was discharged from the military early and then never mentions his marriage and doesn't hold it against Rudy as the court did with Michael. And so I think the court was doing a bit of comparing Michael to Rudy. And Rudy clearly does have a lower IQ score and a more severe disability. And he was talked into the ground by his brother, wasn't he? On this record. On this record, but that is not part of the Atkins inquiry. If you look at the AAIDD and the AA… So I'm not suggesting we're going to retry the case. Sure. We're not going to retry it. Of course. But when you look at the record, we have to see that, don't we? I think you can see that, but it's not part of the consideration of whether Mr. Apel is intellectually disabled. People who are intellectually disabled can commit crimes, they can plan crimes, but that does not mean… Okay, just why don't you close with our standard of review of that? Because we're not hearing the evidence all over again here. Of course. Okay, so what's our standard of review? This court has to look to whether the state court decision was based on an unreasonable determination of the facts or whether it was contrary to or an unreasonable application of Atkins v. Virginia. And based on the fact that you have the burden here. Right. We have the burden of proving under Arizona law by clear and convincing evidence that Mr. Apel was intellectually disabled. And I would argue that in light of the record made before the Superior Court, we met that burden, and the Superior Court's decision otherwise was unreasonable. Okay. Do either of my colleagues have any additional questions? Okay, I've allowed you to go in a little over-over, but I appreciate – I think I can speak for the panel that thank you both for a very prepared and informed argument on this matter, and it will stand submitted, and this court is in recess until tomorrow at 9 a.m. Thank you. All rise.
judges: Farris, Callahan, Owens